Bob Pemberton, Justice *868 In these two causes, the Taylor Housing Authority (THA) appeals a temporary injunction and a second order denying a plea to the jurisdiction THA had asserted as to counterclaims seeking additional relief against it. We will affirm the temporary injunction. However, because governmental immunity bars a portion of the relief sought through the counterclaims at issue, we must affirm the jurisdictional order in part and reverse and dismiss in part.
BACKGROUND
THA is a "municipal housing authority" created by the City of Taylor under Chapter 392 of the Local Government Code,[1] but is a separate governmental entity that has its own five-commissioner governing body.[2] THA commenced the underlying litigation in January 2015-at the behest of federal housing authorities, it claims-to remedy perceived deficiencies in the ownership and operation of three public-housing projects: the Sunset Apartments, a 64-unit complex that THA had constructed in 1977; the Mallard Run Apartments, a 40-unit complex that THA had acquired in 1993; and the Market Apartments, a seven-unit complex that THA had acquired in 2003.
While the parties vigorously dispute many of the underlying facts and their legal significance, there appears to be general agreement regarding certain events that gave rise to the controversy and ensuing litigation. Although THA had once owned all three of the housing projects, it had since formed two nonprofit, 501(c)(3) corporations-appellee Taylor Sunset Housing Development (TSHD) and appellee Mallard Run Housing Development (MRHD)-conveyed record title to the Sunset project to TSHD in 1988, and similarly deeded the Mallard Run project to MRHD in 2001. Despite the ownership change, the projects had initially remained under the control of the THA commissioners because the governing boards of both TSHD and MRHD were then composed of those same five commissioners. The three entities likewise shared a common executive director, who during relevant times was appellee Steve A. Shorts. But through a series of now-disputed measures that THA attributes chiefly to Shorts, the corporate articles for both TSHD and MRHD were amended in 2008 to provide for independent governing boards. Around the same time, TSHD and MRHD also assumed from THA, at least in name,[3] operational control over their respective projects, including collection of rental revenues, property maintenance, and other functions typical of a landlord. MRHD also assumed similar control over the Market Apartments, *869 although it is undisputed that record title for this property remained with THA.
Apparently the three projects were operated in this manner for several years without incident. The controversy arose, according to THA, after its commissioners discovered through an independent auditor's report in 2012 or 2013 that the mortgage on the Market Apartments (the project to which THA still held title) had been paid off by or through MRHD in anticipation that THA (or more precisely Shorts on THA's purported behalf, as THA now portrays the situation) would convey title to the property to MRHD. The ensuing fallout included Shorts's resignation as THA's executive director (although he remained in that role with MRHD for a period thereafter), THA's refusal to convey title of the Market Apartments to MRHD, and the present litigation.
The general focus of THA's litigation efforts has been to clarify or seize (with the distinction depending on the parties' perspectives and the property at issue) legal and fiscal control over MRHD, TSHD, and the three housing projects. THA's strategic focus has evolved over time, however, and the issues in the two appeals each derive from what can be considered different phases of the litigation.
Initially, THA sued Shorts, TSHD, and MRHD, emphasizing allegations to the effect that the 2001 conveyance of the Mallard Run project to MRHD, the 2008 restructurings of the MRHD and TSHD corporate boards, any relinquishment of THA's operational control over the three projects, and the abortive conveyance of title to the Market Apartments had furthered an unauthorized and fraudulent scheme orchestrated by Shorts to divert assets and rental revenues properly belonging to THA instead to the benefit of TSHD, MRHD, or Shorts and members of his family. Based on these allegations, THA sought monetary recovery from Shorts under tort theories and, more critically here, what were styled as claims for declaratory and equitable relief against TSHD and MRHD, accompanied by a claim for the attorney's fees that would be recoverable under the Uniform Declaratory Judgments Act (UDJA).[4] The thrust of the claims against TSHD and MRHD was to seek to establish THA's ownership of the Market Apartments, invalidate the 2001 deed conveying the Mallard Run project to MRHD and the 2008 restructuring of the MRHD and TSHD corporate boards, restore THA's operational and fiscal control over the three housing projects, and recover assets allegedly diverted wrongfully from THA.
After filing suit, THA undertook additional efforts to take operational control of the Market Apartments away from MRHD, including sending letters to project residents advising of a "management change" and instructing them to send their lease payments to THA. MRHD responded to these efforts by seeking a temporary restraining order and later temporary injunction to bar these or other actions by THA that would interfere with its management of the Market Apartments or the Mallard Run project, or with TSHD's management of the Sunset project. The parties ultimately resolved this facet of the controversy, at least temporarily, by entering into a Rule 11 agreement to govern the relationship of THA, MRHD, and TSHD with respect to the three housing projects "until determination of management and ownership of the [projects] is made, upon final hearing or otherwise." The gravamen of this Rule 11 agreement was that THA would operate the Market Apartments during the litigation (including "performing *870 all responsibilities and duties required of the landlord/owner/manager of the Market Apartments required under any agreement or applicable laws, [such as] performing all ongoing maintenance and repairs to the properties, paying for insurance and property taxes, performing lawn maintenance and ... extermination services"),[5] while MRHD and TSHD would similarly continue their respective operation of the Mallard Run and Sunset projects.[6] Of particular relevance, the agreement specified the following in regard to THA's duties:
THA agrees to the current status quo with regard to the remaining two properties (Sunset/Heritage Apartments and Mallard Run Apartments) while this litigation is pending. That is[,] THA shall refrain from taking any action with regard to those properties similar to that taken by THA with regard to the Market [A]partments including, but not limited to[,] unauthorized assumption of management and/or contract with residents.
MRHD also asserted, in the same pleading containing its request for a TRO, counterclaims against THA seeking two categories of relief relating to the Market Apartments. First, MRHD sought remedy for THA's refusal to convey MRHD title to the Market Apartments. MRHD alleged-and attached what purported to be THA records confirming-that the THA commissioners had approved resolutions in 2008 to resign their positions on the governing boards of MRHD and TSHD, to be replaced with new board members, and thereafter to "release all control" of the three housing projects to the now-independent entities.[7] In MRHD's view, these actions, in addition to establishing that the 2008 changes had been properly authorized by the THA commissioners, also amounted to an agreement or promise by THA to convey MRHD title to the Market Apartments.[8] THA's eventual refusal to make the conveyance, MRHD claimed, thereby gave rise to liability for breach of contract, for which MRHD prayed for both damages and specific performance of the alleged agreement to convey title, along with the attorney's fees that would be permitted under Chapter 38 of the Civil Practice and Remedies Code.[9] Alternatively, emphasizing that it had operated the Market Apartments for approximately seven intervening years and had paid off the property's mortgage, MRHD urged that such "detrimental reliance" warranted enforcement of THA's alleged promise to convey title under promissory estoppel, or at least equitable disgorgement of the sums MRHD had paid on the mortgage.
The second category of relief requested through MRHD's counterclaims was predicated on its claimed rights to own or at least operate the Market Apartments, and complained of THA's takeover of that project. MRHD sought recovery of damages, in the form of lost rental income, under a *871 theory of tortious interference with MRHD's rental contracts with residents.
The litigation continued down this general path until early 2016, when THA posted a 72-hour public notice for a commissioner meeting whose agenda items included:
Review, discuss, consider, and take action on a resolution to remove certain members of the Board of Directors of [MRHD] and appoint new members of the Board of Directors of [MRHD]....
The notice also included a parallel agenda item referring to the THA commissioners' removal and replacement of board members of the second housing nonprofit, TSHD. Each of these agenda items also elaborated that "such action is taken pursuant [to] the Public Facilities Corporation Act." The significance of this reference to the Public Facilities Corporation Act (PFCA),[10] as illuminated by subsequent events in the litigation, was that THA was now maintaining that this statute had given it legal control over MRHD and TSHD all along. Although THA had undisputedly formed those two entities under the Texas Non-Profit Corporation Act rather than the PFCA (and indeed, the original formation had preceded the PFCA's 1995 enactment), THA insisted that the two were nonetheless made "public facilities corporations," and THA their controlling "sponsor," by virtue of a PFCA provision stating that a nonprofit corporation created by a housing authority "is considered a corporation under this chapter and has the rights and powers necessary or convenient to accomplish a corporation's purposes under this chapter."[11] The implications, in THA's view, included giving its commissioners the heretofore unexercised (and, appellees suggest, also heretofore unperceived) powers to appoint or remove the entities' board members.[12]
Upon their discovery of the meeting notice-by happenstance, they claim-MRHD and TSHD commenced efforts to obtain additional injunctive relief to restrain THA's efforts to assume control over their respective boards under color of the PFCA. They urged, among other complaints, that THA's newfound PFCA theory was a meritless contrivance to circumvent the district court's jurisdiction over the pending claims and also violated the parties' Rule 11 agreement. In reply to these efforts, THA ultimately agreed to postpone the scheduled commissioners' meeting pending a hearing on a temporary restraining order. The district court ultimately granted this TRO, preventing the meeting from going forward.
Meanwhile, THA had also made additional legal filings predicated on its new PFCA theory. THA filed a separate lawsuit naming each member of the MRHD and TSHD boards as defendants in that capacity, and seeking to compel their compliance with THA's directives through what was couched as mandamus relief to enforce the powers THA now claimed under the PFCA. Contemporaneously, THA also filed an amended petition that nonsuited its affirmative claims against MRHD and TSHD (which had arguably been inconsistent with or at least redundant of its new PFCA theory). And on the same day, THA also filed a motion to show *872 authority, disputing-under THA's view of the PFCA-that MRHD and TSHD had power to retain their counsel or expend litigation funds without authorization from their "sponsor," THA. These filings were followed a few days later by a plea to the jurisdiction, predicated on governmental immunity claimed by THA, seeking dismissal of the counterclaims MRHD had previously asserted in response to THA's now-dismissed affirmative claims.[13]
Thereafter, following an evidentiary hearing, the district court signed orders denying THA's plea to the jurisdiction and granting a temporary injunction that ordered THA "and any of its agents, employees, or persons acting in concert with it" to:
a. Refrain from taking any action in any way relating to the removal, replacement, change or otherwise affecting of the board of directors, officers, directors employees, representatives or residents of Mallard Run Housing Development Corporation (MRHD), Taylor Sunset Housing Development Corporation ( [TSHD] ), the Mallard Run Apartments or the Sunset/Heritage Apartments;
b. Refrain from taking any action or in any way interfering with the corporate governance, management, operations or other actions of MRHD, [TSHD], the Mallard Run Apartments or the Sunset/Heritage Apartments;
c. Refrain from violating the Rule 11 Agreement dated April 22, 2015, including in any way disrupting the status quo of MRHD, [TSHD], the Sunset/Heritage Apartments, or the Mallard Run Apartments;
d. Refrain from contacting, threatening or harassing any board member, officer, director, employee or other representatives of MRHD or [TSHD] in any way relating to any pending lawsuit or its claims or relating to the corporate governance, management, operations or use of MRHD, [TSHD], the Mallard Run Apartments, the Sunset/Heritage Apartments or the Market Apartments.[14]
THA perfected an appeal from each order,[15] which we have consolidated for purposes of argument and this opinion.
*873 PLEA TO THE JURISDICTION
THA's jurisdictional challenge to the counterclaims at issue, both below and on appeal, has been founded solely on governmental immunity as a bar to suit. MRHD has not disputed that THA is a type of entity that would generally enjoy governmental immunity with respect to its acts and functions,[16] nor purported to establish any applicable statutory or constitutional waiver of such immunity as to these counterclaims. The point of contention, rather, has been whether THA's previous assertion of affirmative claims against MRHD has effectively abrogated any immunity THA would otherwise possess against MRHD's counterclaims, under the principle recognized by the Texas Supreme Court in Reata Construction Corp. v. City of Dallas .[17] This principle from Reata was summarized succinctly by the Texas Supreme Court in its very recent Borunda decision:
We held in Reata that when a governmental entity asserts claims for monetary relief, immunity does not protect the entity against the defendant's counterclaims for monetary relief that are "germane to, connected with, and properly defensive to" the government's claims. This is not because the governmental entity "waives" its immunity by filing a claim for affirmative relief. Instead, the scope of governmental immunity simply does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an "offset" against the government's recovery on its affirmative claims.[18]
This qualification or limitation on immunity squares with the doctrine's underlying fiscal policies, the supreme court further observed, because " 'when the [government] sues a private party, the general public stands to lose nothing' " from an offsetting counterclaim, as "any outcome in favor of a counterclaiming defendant would not be paid with taxpayer dollars" but from the government's recovery, and because the government has already made the decision to incur the associated litigation costs when it filed its affirmative claim.[19] A further justification emphasized by the high court is that "it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it."[20] And a corollary to the Reata principle, also reiterated in Borunda , is that the government's subsequent nonsuit of its affirmative claims, as occurred with THA, does not "reinstate" (or more precisely "create") immunity that does not exist by virtue of the affirmative claims.[21] Such a nonsuit would instead bear upon the counterclaimant's right of recovery on the merits, to the extent it would impact the existence of any governmental recovery against which the counterclaimant could *874 obtain an offsetting recovery.[22]
THA's core challenge to the district court's jurisdictional ruling is that the Reata principle cannot aid MRHD because THA asserted no affirmative claim for monetary relief against MRHD. THA's sole claims for monetary relief, it insists, were against Shorts. THA's characterization of its affirmative claims is belied by its pleadings, especially when viewed in the light favorable to MRHD, as we must.[23]
In what was styled as one of its claims under the UDJA, THA sought a declaration that "all real and personal property transferred or taken from THA [and] placed under the management, operation or control of MRHD and TSHD resulting from Shorts' improper actions ... be restored to THA with all benefits and income derived from such property from the date of transfer. "[24] Similarly, THA prayed for the imposition of a constructive trust upon "the real and personal property improperly conveyed by and held by Defendants [i.e., including MRHD], as well as all income and benefits derived from the property. "[25] Read in context with THA's underlying factual allegations at the time, the emphasized claims would encompass recovery of monetary relief from MRHD, including rental revenues and other financial benefits MRHD had allegedly obtained wrongfully from the housing projects at issue since at least 2008-including revenues and funds from MRHD's operation of the Market Apartments, the subject matter of MRHD's counterclaims.
In urging otherwise, THA emphasizes conceptual distinctions between claims for "money damages," per se , versus declaratory or equitable relief. THA's argument is the analog of the now-rejected notion that a claimant can "circumvent the State's sovereign immunity from suit by characterizing a suit for money damages, such as a contract dispute, as a declaratory-judgment claim."[26] Just as a private litigant cannot avoid immunity merely by couching an immunity-implicating substantive claim in UDJA form, THA cannot use the UDJA or an equitable theory to disguise the absence of immunity under Reata due to its assertion of what are substantively claims for monetary recovery against MRHD. Similarly unavailing is a distinction THA would draw on the basis that its claims did not seek "monetary relief" from MRHD, but only to assert control over "property that, according to HUD, was rightfully THA's property." We cannot agree that application of Reata depends in this way upon the merits of the parties' competing claims to the money. Rather, it is enough that THA asserted affirmative claims for monetary relief against MRHD, creating the first condition under which the Reata *875 limitation would apply.[27]
The remaining Reata condition is also satisfied. MRHD's counterclaims are "germane to, connected with, and properly defensive to" THA's claims for monetary relief. THA sought to recover funds it alleges MRHD wrongfully diverted from the Market Apartments, and MRHD's counterclaims seek remedies predicated on its converse position that it is the proper owner and operator of those apartments. Indeed, THA does not dispute MRHD's satisfaction of this condition, aside from THA's mistaken premise that it sought monetary recovery only from Shorts.
The import of these holdings under Reata and its progeny is that THA does not enjoy immunity against MRHD's counterclaims to the extent that MRHD can obtain a monetary recovery as an offset to any monetary recovery THA would obtain on its affirmative claims against MRHD.[28] While THA's intervening nonsuit is relevant to whether there will ultimately be any recovery by THA against which MRHD can obtain an offsetting recovery, it remains that MRHD's claims to that offset are not barred jurisdictionally.[29] Consequently, the district court did not err in denying THA's plea to the jurisdiction to this extent.
But this analysis does not resolve whether THA enjoys immunity against an additional form of relief that MRHD also requested through its counterclaims. Alongside its claims for monetary relief, MRHD sought to compel THA, through specific performance or promissory estoppel, to convey it title to the Market Apartments. To demonstrate the district court's jurisdiction over these additional claims for relief, MRHD advocates what it acknowledges to be a novel extension of the Reata principle to permit it to obtain this additional relief as an "offset" against THA's declaratory claims that would have established THA's countervailing claimed right to the Market Apartments. In addition to emphasizing the "fundamental fairness" policy underlying the Reata principle, MRHD reasons that its position as an adverse claimant asserting rights to the Market Apartments is the logical equivalent of a counterclaimant seeking an offsetting monetary recovery against the government.
In a 2011 case, the Texas Supreme Court did not reject out of hand that Reata might have application in the context of competing declaratory claims, but ultimately held the limitation inapplicable on other grounds.[30] We are also aware that a single sister court, albeit in a memorandum opinion, held that Reata applied in *876 the context of competing declaratory claims to determine whether a city or private property owner had superior rights with respect to a culvert,[31] a situation somewhat analogous to the title-related dispute here. However, the Texas Supreme Court to date has never affirmatively held the Reata principle to apply in any scenario other than where the government asserts affirmative monetary claims and the opponent asserts offsetting monetary claims.[32] On the contrary, its analyses have signaled that the Reata principle's application hinges on the government's assertion of an affirmative claim for monetary relief, not for some other kind of relief.[33]
Unless and until the Texas Supreme Court instructs us otherwise, this intermediate appellate court must adhere to these existing parameters of the Reata principle.[34] These existing parameters do not extend to abrogating THA's immunity against MRHD's counterclaims that would compel THA to convey MRHD title to the Market Apartments. Nor would this extension of Reata be supported by the limitation's policy underpinnings. As MRHD recognizes, its counterclaims seeking title to the Market Apartments would "offset" THA's declaratory claims only in the sense that the claims "are mirror images: either THA owns the propert[y], or [MRHD] do[es]." Consequently, if MRHD prevails and obtains title to the Market Apartments, THA would correspondingly lose title, a zero-sum battle in which THA would obtain no affirmative relief against which MRHD's recovery could be "offset." Rather, MRHD's recovery would come at the direct detriment to THA and, ultimately, the City of Taylor's taxpayers-a core concern underlying immunity doctrine that the Reata limitation, properly applied, would not infringe.[35] MRHD's proposed *877 extension of Reata would also conflate the requirement that the claims against government be "germane to, connected with, and properly defensive to" the government's claims with the qualification that immunity is abrogated only to the extent of an offsetting recovery. Under MRHD's view, seemingly any claim against government that is "germane to, connected with, and properly defensive to" the government's affirmative claims would ipso facto also be "offsetting" in the sense Reata requires, contrary to the Texas Supreme Court's emphasis on both requirements as distinct features of the immunity limitation.[36]
Accordingly, MRHD's counterclaims seeking to compel THA to convey title to the Market Apartments implicate THA's governmental immunity. And because MRHD has not attempted to establish any waiver of THA's immunity as to those claims, they are barred jurisdictionally. As to these claims for relief, we must reverse the district court's order and dismiss. However, the district court did not err in denying THA's plea as to the remaining counterclaims THA also challenges, which affirmatively sought monetary relief.
TEMPORARY INJUNCTION
THA brings three issues in its appeal of the temporary injunction, which can be summarized as challenges to the district court's jurisdiction to issue the injunction, to the evidentiary support for the elements required to be proven before such issuance, and to the injunction's compliance with one of the requirements of Texas Rule of Civil Procedure 683.
A temporary injunction is an "extraordinary remedy" whose purpose is to preserve the status quo of the litigation's subject matter pending a decision on the merits.[37] The "status quo" is "the last actual, peaceable, non-contested status which preceded the pending controversy."[38] With respect to the temporary injunction here, the relevant "status quo" also includes the Rule 11 agreement executed by THA, MRHD, and TSHD earlier in the litigation, as the district court had a ministerial duty to enforce its terms against both sides.[39]
To obtain a temporary injunction, an applicant must plead and present evidence of three elements: (1) a cause of action against the defendant; (2) a "probable right" to the relief sought (which means simply alleging a cause of action *878 and presenting some evidence tending to sustain it[40] ); and (3) a probable, imminent, and irreparable injury in the interim.[41] An "irreparable" injury refers to one that is incapable of being compensated adequately in damages or for which damages cannot be measured by any certain pecuniary standard.[42]
Consistent with the purposes of a temporary injunction, an appeal of such an order does not present the merits of the underlying case for review, but only whether the trial court abused its discretion in determining whether or not the applicant is entitled to preservation of the status quo pending determination of those merits.[43] We do not substitute our judgment on that determination unless the district court's action was so arbitrary that it exceeded the bounds of reasonable discretion.[44] We review the evidence before the district court in the light most favorable to that court's ruling, draw all reasonable inferences from the evidence, and defer to the district court's resolution of conflicting evidence.[45] A trial court does not abuse its discretion if it heard conflicting evidence and evidence in the record reasonably supports the trial court's decision.[46]
THA's first two issues are founded on the presumption that the PFCA governs its relationship with MRHD and TSHD. From this standpoint, THA insists that the temporary injunction, by preventing its commissioners from exercising a "statutory duty" and "discretionary powers" under the PFCA to control the composition of MRHD and TSHD's boards, is barred by governmental immunity and "causes the judiciary to intrude into legislative functions." It follows, THA adds, that the claims "are not ripe" unless and until the board meets and actually votes to remove the board members. From that same premise, THA urges that MRHD and TSHD have not shown a cause of action, a probable right to the relief sought, or probable, imminent, and irreparable injury with respect to establishing the non -applicability of the PFCA. In THA's view, the district court impliedly resolved that issue in favor of MRHD and TSHD in granting its temporary injunction. This was improper, THA continues, because such "unclear legal issues" at the heart of a case should be resolved on the merits rather than through pretrial injunctive relief, citing in support of that principle the Texas Supreme Court's *879 In re Newton[47] and this Court's Texas Department of State Health Services v. Holmes.[48]
At bottom, THA's arguments are grounded in the view that the relevant status quo is not the actual state of affairs regarding the three housing projects that began in 2008 and was modified by the Rule 11 agreement, but is the legal relationship that THA perceives (at least since its shift in litigation strategy) to be created or required by the PFCA. THA relies on the rule that injunctive relief should not be used to perpetuate a "status quo" of "illegal" conduct,[49] (the "illegal" conduct being the current structure and operation of the MRHD and TSHD boards, assuming THA's position that these violate the PFCA). In this regard, Newton and Holmes ultimately cut against THA's position-these cases instruct that the district court was within its discretion to view the existing state of affairs with MRHD, TSHD, and the three housing projects as the relevant status quo and reserve the now-pivotal question of the PFCA's applicability for the merits.[50] As we summarized the principle in Holmes , "A trial court does not commit a clear abuse of discretion in issuing a temporary injunction where ... the question of whether the status quo constitutes illegal conduct 'is the central question of the suit,' and therefore 'should be determined with a full trial on the merits.' "[51] Nor, similarly, would it be an abuse of discretion to reserve to a later juncture THA's jurisdictional challenges to the temporary injunction, which are likewise predicated on the PFCA's applicability.[52]
We also cannot conclude that the district court abused its discretion in determining that MRHD and TSHD had proven a cause of action, a probable right to the relief sought, and probable, imminent, and irreparable injury from THA's actions under color of the PFCA. Among other things, THA "agree[d]" in the Rule 11 agreement "to the current status quo with regard to the ... Sunset/Heritage Apartments and Mallard Run Apartments ... while this litigation is pending," and the evidence-and indeed, THA's court filings-tend to demonstrate that THA was instead seeking to seize control of MRHD and TSHD's boards of directors, take full control of the housing projects, and shut down all means by which the entities could ever obtain any remedy against THA through litigation. THA insists that the Rule 11 agreement left room for it to pursue the actions it did, urging that the agreement "does not discuss appointment *880 of board members" and "retained [THA's] right to seek additional relief from the court which it sought in its [mandamus petition]." The district court did not abuse its discretion in impliedly rejecting that view of THA's actions and the Rule 11 agreement.
While MRHD and TSHD assert additional arguments in support, we need go no further to hold that the district court did not abuse its discretion in deciding to issue a temporary injunction.[53] We overrule THA's first and second issues.
In THA's third and final issue, it argues that the temporary injunction does not comply with all of the requirements of Texas Rule of Civil Procedure 683. Rule 683 requires that "[e]very order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained."[54] "Every order granting a temporary injunction," moreover, "shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought."[55] "The requirements of Rule 683 are mandatory and must be strictly followed."[56] "When a temporary injunction order does not adhere to the requirements of Rule 683 [,] the injunction order is subject to being declared void and dissolved."[57]
THA's challenge under Rule 683 contests only compliance with the requirement that the order "shall set forth the reasons for its issuance." However, as appellees point out, THA did not raise this complaint before the district court. Under this Court's longstanding precedent, a complaint of noncompliance with this requirement of Rule 683 is considered one of form that is waived unless preserved before the trial court.[58] While some of our sister courts have viewed the issue differently, THA has not persuaded us that we should reconsider our precedent under the circumstances here.[59] Accordingly, because THA has not preserved its complaint regarding the specificity of the temporary injunction's stated grounds, we overrule its third issue.
CONCLUSION
We affirm the district court's order denying THA's plea to the jurisdiction except with regard to MRHD's counterclaims seeking to compel THA, through specific performance or promissory estoppel, to convey it title to the Market Apartments. To this limited extent, we reverse the order and render judgment dismissing those claims for relief. We affirm the temporary injunction THA has challenged.

See Tex. Loc. Gov't Code §§ 392.001 -.104.

See id. §§ 392.006, .031.

This qualification is made to acknowledge allegations by THA that Shorts, in practice, commingled the three entities' assets and operated them as his alter egos. Appellees have joined issue with these allegations and others, and their merits are not yet before us.

See Tex. Civ. Prac. & Rem. Code § 37.009 ; see generally id. §§ 37.001-.011.

THA also agreed to maintain and keep accurate accounting of all income and revenues it obtained from the Market Apartments.

MRHD and TSHD also agreed not to transfer, alienate, or encumber title to any real property they held.

According to MRHD, the changes were driven not by a fraudulent objective, but more innocuous concerns about an anticipated cessation of administrative fees that the federal government had formerly been paying to THA.

MRHD also alleged that THA had reaffirmed this agreement or promise subsequently through communications reflecting a shared understanding that the deed transfer was a mere formality remaining to be performed.

See Tex. Civ. Prac. & Rem. Code § 38.001(8).

See generally Tex. Loc. Gov't Code §§ 303.001 -.124.

Id. § 303.022.

See id. § 303.035(a) ("A [public facilities] corporation's affairs are governed by a board of directors composed of at least three individuals appointed by the sponsor's governing body."), (d) ("The sponsor's governing body may remove a director for cause or at any time without cause.").

THA's plea also challenged jurisdiction over additional counterclaims that MRHD, joined by TSHD and Shorts, had asserted through an intervening amended pleading. These additional counterclaims sought declaratory relief under the UDJA and were essentially converses of declaratory claims that THA had previously asserted. THA has not brought this portion of its jurisdictional challenge forward on appeal. Similarly not at issue here are further counterclaims-including still more declaratory claims and a takings claim-that appellees added through pleading amendments made subsequent to the hearing on THA's plea and the temporary injunction. While these further counterclaims were added prior to the district court's order denying the plea, they were not challenged by THA below, and THA disclaims any present jurisdictional challenge here. Accordingly, our analysis of THA's jurisdictional challenges to counterclaims is addressed solely to MRHD's previously described contractual, equitable, and tortious-interference claims.

The district court also consolidated THA's mandamus action with the original cause, which by then consisted only of a winnowed version of THA's affirmative claims against Shorts and appellees' counterclaims in their amended form.

See Tex. Civ. Prac. & Rem. Code § 51.014(a)(4) ("A person may appeal from an interlocutory order of a district court ... that ... grants ... a temporary injunction...."), (8) (similarly permitting appeal of interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit").

See Tex. Loc. Gov't Code § 392.006 ("For all purposes ... a housing authority is a unit of government and the functions of a housing authority are essential governmental functions and not proprietary functions.").

197 S.W.3d 371, 376-77 (Tex. 2006).

C. Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth. , 540 S.W.3d 548, 549-50 (Tex. 2018) (per curiam) (quoting Reata , 197 S.W.3d at 376-77 ).

Id. at 553 (quoting City of Galveston v. State , 217 S.W.3d 466, 472 (Tex. 2007), and citing City of Dallas v. Albert , 354 S.W.3d 368, 379 (Tex. 2011), and Reata , 197 S.W.3d at 375 ).

Id. at 553 (citing Reata , 197 S.W.3d at 375-76 ).

See id. at 550-51 (quoting Albert , 354 S.W.3d at 374-75 ).

See ids="9152729" index="12" url="https://cite.case.law/sw3d/146/648/#p651">id. at 550-51 (citing Albert , 354 S.W.3d at 376 ).

See, e.g. , Texas Parks & Wildlife Dep't v. Miranda , 133 S.W.3d 217, 226-27 (Tex. 2004). We would likewise view any material evidence in MRHD's favor. See, e.g. , GTECH Corp. v. Steele , 549 S.W.3d 768, 776-77, No. 03-16-00172-CV, 2018 WL 454922, *5-6 (Tex. App.-Austin Jan. 11, 2018, no pet. h.) (collecting authorities).

Emphasis added.

Emphasis added.

Texas Nat. Res. Conservation Comm'n v. IT-DAVY , 74 S.W.3d 849, 856 (Tex. 2002) ; see also Texas Parks & Wildlife Dep't v. Sawyer Trust , 354 S.W.3d 384, 388 (Tex. 2011) (discussing broader principle that "sovereign immunity will bar an otherwise proper [U]DJA claim that has the effect of establishing a right to relief against the State for which the Legislature has not waived sovereign immunity" (citing City of Houston v. Williams , 216 S.W.3d 827, 828-29 (Tex. 2007) (per curiam) ) ).

Under the circumstances here, we need not address whether THA's accompanying claim for UDJA attorney's fees would also be a claim for monetary relief that abrogates immunity or would be subject to offset. See City of McKinney v. Hank's Rest. Grp., L.P. , 412 S.W.3d 102, 119-20 (Tex. App.-Dallas 2013, no pet.) (holding that city's offensive claim for attorney's fees abrogated immunity under Reata ); cf. Texas Dep't of Criminal Justice v. McBride , 317 S.W.3d 731, 732-33 (Tex. 2010) (per curiam) (holding that government claims for attorney's fees incurred in defending declaratory claims do not abrogate immunity under Reata ).

See, e.g. , Borunda , 540 S.W.3d at 550-51 ; Reata , 197 S.W.3d at 377.

See Borunda , 540 S.W.3d at 550-51 (quoting Albert , 354 S.W.3d at 374-75 ).

See Sharyland Water Supply Corp. v. City of Alton , 354 S.W.3d 407, 413-14 (Tex. 2011) (assuming for purposes of analysis that Reata would apply where governmental entity has asserted declaratory claim to rescind easement and establish property rights, but holding limitation inapplicable because counterclaims did not meet relatedness requirement).

See Redburn v. Garrett , No. 13-12-00215-CV, 2013 WL 2149699, at *8-10, 2013 Tex. App. LEXIS 6005, at *21-25 (Tex. App.-Corpus Christi 2013, pet. denied) (mem. op. on reh'g) (applying Reata to permit landowner's claim seeking declaratory judgment that city "does not have an easement or other legal authority to enter [landowner's] property" where city had asserted declaratory claim to establish the affirmative proposition).

See Borunda , 540 S.W.3d at 550-51 (governmental claims for damages for breach of contract and offsetting monetary claims); City of Dallas v. Martin , 361 S.W.3d 560, 560-61 (Tex. 2011) (governmental claims seeking recovery of alleged overpayments to police officers, firefighters, and rescue workers and competing monetary claims); Albert , 354 S.W.3d at 372, 374-75 (same); State v. Fidelity & Dep. Co. , 223 S.W.3d 309, 310-11 (Tex. 2007) (per curiam) (TxDOT suit for damages on performance bond and competing monetary claims); City of Irving v. Inform Constr., Inc. , 201 S.W.3d 693, 694 (Tex. 2006) (per curiam) (city claim for breach-of-contract damages and competing monetary claims); Reata , 197 S.W.3d at 376-77 (governmental claims for monetary relief and competing monetary claims); accord Hank's Rest. Grp. , 412 S.W.3d at 116 (similarly concluding that "[s]ince Reata , the supreme court has indicated that the Reata rule is limited to offsetting counterclaims for monetary relief," and that "a governmental entity's affirmative claim for declaratory relief does not have any effect on the entity's immunity from counterclaims for declaratory relief").

See Manbeck v. Austin Indep. Sch. Dist. , 381 S.W.3d 528, 532-33 (Tex. 2012) (per curiam) (holding that governmental entity's appeal of administrative ruling through suit for judicial review did not implicate Reata and distinguishing Reata , 197 S.W.3d at 375-78, and Albert , 354 S.W.3d at 373-75, as involving "affirmative claim for monetary relief" and "affirmative claim for monetary damages").

See, e.g. , Petco Animal Supplies, Inc. v. Schuster , 144 S.W.3d 554, 565 (Tex. App.-Austin 2004, no pet.).

See Reata , 197 S.W.3d at 375 ("If the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted."); see also Sawyer Trust , 354 S.W.3d at 388-90, 393-94 (applying longstanding rule of State v. Lain , 162 Tex. 549, 349 S.W.2d 579, 582 (1961), that a "suit for land" asserted directly against the government implicates immunity and that such immunity can be avoided only if title issue is litigated through ultra vires rubric and the rival claimant ultimately wins).

See, e.g. , Borunda , 540 S.W.3d at 549-550 ("We held in Reata that when a governmental entity asserts claims for monetary relief, immunity does not protect the entity against the defendant's counterclaims for monetary relief that are 'germane to, connected with, and properly defensive to' the government's claims.... [T]he scope of governmental immunity simply does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an 'offset' against the government's recovery on its affirmative claims. " (emphasis added) (quoting Reata , 197 S.W.3d at 376-77 ) ).

See, e.g. , Butnaru v. Ford Motor Co. , 84 S.W.3d 198, 204 (Tex. 2002) ; Walling v. Metcalfe , 863 S.W.2d 56, 57 (Tex. 1993) (per curiam).

In re Newton , 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding) (quoting Janus Films, Inc. v. City of Fort Worth , 163 Tex. 616, 358 S.W.2d 589, 589 (1962) (per curiam) ).

See, e.g. , Shamrock Psychiatric Clinic, P.A. v. Texas Dep't of Health & Human Servs. , 540 S.W.3d 553, 559-61 (Tex. 2018) (per curiam).

See Intercontinental Terminals Co. v. Vopak N. Am., Inc. , 354 S.W.3d 887, 897 (Tex. App.-Houston [1st Dist.] 2011, no pet.) (making this observation and further emphasizing that applicant "need not show that it will prevail at trial") (citing Butnaru , 84 S.W.3d at 211 ; Camp v. Shannon , 162 Tex. 515, 348 S.W.2d 517, 519 (1961) ; Anderson Oaks (Phase I) Ltd. P'ship v. Anderson Mill Oaks, Ltd. , 734 S.W.2d 42, 44 n.1 (Tex. App.-Austin 1987, no writ) ).

Butnaru , 84 S.W.3d at 204.

Id. ; see also Intercontinental Terminals , 354 S.W.3d at 895 (observing that this requirement incorporates the concept of lacking an "adequate remedy at law," "one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief").

See Davis v. Huey , 571 S.W.2d 859, 861-62 (Tex. 1978).

Butnaru , 84 S.W.3d at 204.

See Davis , 571 S.W.2d at 862 ; INEOS Grp. Ltd. v. Chevron Phillips Chem. Co. , 312 S.W.3d 843, 848 (Tex. App.-Houston [1st Dist.] 2009, no pet.).

ICON Benefit Adm'rs II, L.P. v. Abbott , 409 S.W.3d 897, 902 (Tex. App.-Austin 2013, pet. denied) (citing Butnaru , 84 S.W.3d at 211 ; Davis , 571 S.W.2d at 862 ; INEOS , 312 S.W.3d at 848 ).

146 S.W.3d at 651-52.

294 S.W.3d 328, 333-34 (Tex. App.-Austin 2009, pet. denied) (op. on reh'g).

See Newton , 146 S.W.3d at 651 & n.14 (acknowledging principle that statutory violation cannot be continued as the status quo because there would never be condition in which that conduct could lawfully continue).

See ids="9152729" index="65" url="https://cite.case.law/sw3d/146/648/#p651">id. at 651-52 (citing, with approval, City of Arlington v. City of Fort Worth , 873 S.W.2d 765, 769 (Tex. App.-Fort Worth 1994, writ dism'd w.o.j.), and holding that trial court abused discretion in granting TRO premised on determination turning on "important and difficult issues" under Election Code that longstanding practices by political action committee violated that code); Holmes , 294 S.W.3d at 333-34 (rejecting appellate challenge to temporary injunction preserving applicant's right to continue using laser hair removal device on basis that such use was illegal).

Holmes , 294 S.W.3d at 333-34 (quoting City of Arlington , 873 S.W.2d at 769 ).

See Miranda , 133 S.W.3d at 227 (recognizing trial court's discretion to determine whether jurisdictional determination entailing consideration of evidence should be made at preliminary stage or await further development of the case).

See Tex. R. App. P. 47.1.

Tex. R. Civ. P. 683.

Id.

InterFirst Bank San Felipe, N.A. v. Paz Constr. Co. , 715 S.W.2d 640, 641 (Tex. 1986) (per curiam).

Id.

See Emerson v. Fires Out, Inc. , 735 S.W.2d 492, 493-94 (Tex. App.-Austin 1987, no writ).

See Hoist Liftruck Mfg., Inc. v. Carruth-Doggett, Inc. , 485 S.W.3d 120, 123-27 (Tex. App.-Houston [14th Dist.] 2016, no pet.) (Frost, C.J., concurring) (compiling cases illustrating split of authority among courts of appeals and urging that this Court's view is the better one).